Filed 12/24/15 In re R.E. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re R.E., a Person Coming Under the Juvenile Court Law. | B265113 (Los Angeles County Super. Ct. No. DK03612) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.M., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra L. Losnick, Commissioner. Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Julia Roberson, Senior Associate County Counsel, for Plaintiff and Respondent.

_____

J.M. (mother) appeals from juvenile court orders finding jurisdiction over her three-year-old daughter R.E. and removing R.E. from her custody.  We affirm.

## BACKGROUND

### February 10, 2014 Petition

On February 10, 2014, the Department of Children and Family Services (DCFS) filed a petition under Welfare and Institutions Code[1] section 300, subdivision (b) regarding R.E., then 21 months old.  In (b)(1) of the petition, DCFS alleged mother had a five-year history of substance abuse, currently used methamphetamine and marijuana, and on prior occasions was under the influence while R.E. was in her care and supervision, placing R.E. at risk of harm.  In (b)(2), DCFS alleged mother also had a history of mental and emotional problems, including bipolar disorder, and on prior occasions had failed to take her psychotropic medication as prescribed, making her incapable of providing regular care and putting R.E. at risk of harm.  A referral on January 15 had reported that mother did not change R.E.'s diaper for more than three hours and had a history of using methamphetamine.  Mother came home demanding to take R.E. with her, but the caller refused because mother's pupils were dilated, her eyes were "glossy," and she was picking at her arms and face.  Mother's behavior had changed three to four days earlier, and the caller believed mother was using drugs outside the home.

In an interview on January 16, mother could not focus and appeared to be under the influence, with erratic behavior, slurred and incoherent speech, shaking, fidgeting, and constant picking at her scabs.  She stated she had bipolar disorder but was not taking medication or using drugs, last used methamphetamine three years ago, drank alcohol, and had used marijuana two months ago.  Maternal grandmother (MGM) and step-grandfather (MSGF) took care of R.E., and "'[t]hey want to take my baby.'"  Mother planned to get an apartment with her girlfriend of one week.  Father lived in Tijuana and

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

she had not seen him for months.[2]  Mother agreed to a safety plan:  she would drug test and leave R.E. in the grandparents' care.

R.E. was healthy and well, showed no signs of abuse or neglect, and interacted appropriately.  MSGF stated that mother did not properly care for R.E. and would leave at random without plans for R.E.; he and MGM did everything for R.E.  Mother had a history of mental illness and was not on medication.  In December 2013, MSGF had found mother at home, smoking marijuana with R.E. present.  Mother had not smoked in the home since.

On January 24, MGM reported that mother was mildly developmentally delayed and defiant.  She had not seen mother or been able to contact her since the referral.  MGM and MSGF would have to step in to change R.E.'s diaper, and MGM did not think mother could properly care for R.E., especially if she was using drugs.  Although mother claimed to have been sober for three years, her behavior had been changing.  She would leave during the day and return at 10:00 p.m., wanting to take R.E. out, which MGM would not allow.  Mother was secretive and would not tell MGM where she was.

Mother tested negative for drugs on January 27, 2014.  The next day she left the social worker a voicemail saying she had found a home (she did not provide an address), and "wanted to 'pick up her baby.'"  The social worker was unable to contact mother, and on February 4, 2014, arranged with MGM and MGF to detain R.E. on February 5 and place her in the home of a maternal cousin (MC).  Mother still had not contacted DCFS or her family.  DCFS recommended that R.E. receive a mental health assessment, that mother complete parenting education, individual counseling, and a substance abuse program, and that her visitation with R.E. be monitored.

On February 10, 2014, the court detained R.E. in the home of MC with a referral to regional services, and monitored visitation and referrals for mother.

A jurisdiction/disposition report filed April 4, 2014 reported that in a March 18 interview, mother seemed well-oriented to time and space and expressed herself normally

---

[2] Father is not a party to this appeal.

with a flat affect, a slight speech impediment and a tendency to fixate on objects while speaking. She had used methamphetamine daily for a year until over three years ago, and had used marijuana since she was 16, last smoking two weeks ago. When stressed, mother usually smoked about "'15 blunts'" with friends every other day, but never near R.E. or at home. She had been diagnosed with bipolar disorder but stopped taking her prescribed Seroquel two years ago, without consulting a physician. The medication made her sleepy and tired, although it also calmed her, and without it she swore at people and became angry and frustrated. She had not participated in any treatment or visited a doctor or therapist. She denied leaving R.E. for more than a few hours. In a telephone interview, father stated that mother brought R.E. with her to Tijuana every few months, and he never saw her under the effect of drugs or observed any strange behavior. Mother was slow and did not know how to clean dishes or mop the floor, and usually needed help feeding and cleaning the baby. He did not think mother could care for R.E. without assistance by another adult.

When interviewed in March 2014, MGM characterized mother as sweet and docile, but incapable of caring for R.E. alone. As a child, mother was diagnosed with defiant disorder, speech problems, mild retardation, learning disabilities, and comprehension and retention problems, and she had received special education services at school. At 16 mother began running away, disappearing for up to a month. Father was much older than mother and MGM feared he took advantage of her. Mother and R.E. had always lived with MGM. Mother left R.E. in the play pen almost daily for hours with only a bottle, and she had to be reminded to change R.E.'s diaper. It was a "constant struggle" to get mother to respond to R.E.'s needs, as mother would refuse to listen or would stay in bed. Mother did not know how to cook, so MGM prepared the baby's food.

MSGF said that a few weeks before DCFS intervened, mother began leaving home for days, returning late at night asking to take R.E. with her, once while appearing under the influence of drugs. Twice, he had seen mother smoke marijuana from a pipe at home with R.E. close by. It was a struggle to get mother to feed R.E. She insisted on feeding

4

R.E. "'Flaming Hot Cheetos.'" He and MGM argued with mother about the need to care for and stimulate R.E., but she allowed R.E. to stay for hours in a playpen soiled with urine: "mother lacks the sense to care for a baby safely."

DCFS assessed R.E. as at risk from mother's "unstable, irrational and neglectful behavior associated with her emotional/mental health problems and her drug use." Mother was bipolar, did not take her medication, and used marijuana as much as every other day. She was not always attentive to R.E. and sometimes neglectful, showing "recurrent and persistent behaviors related to a possible severe, undiagnosed mental health disorder, and to her ongoing abuse of marijuana." Mother's condition was "severe and unpredictable" although she was well-intentioned and motivated. A thorough evaluation of mother's psychological health and cognitive abilities should be completed to determine whether she could properly parent and keep R.E. safe.

An April 2014 multidisciplinary assessment reported that R.E. had microcephaly (a smaller head than normal). R.E. had up to three daily tantrums. Her affect during play was flat and unsmiling, and although she was active and happy, she had poor communication skills, and her gross and fine motor skills, problem-solving skills, and social skills did not meet developmental milestones.

A supplemental report filed September 22, 2014 stated that DCFS was unable to approve the maternal grandparents' home for placement due to MGM's prior substance abuse and mental health issues. Mother had refused to travel to MC's home to allow assessment of her interaction with R.E. Mother had visited twice, driven by MGM, who had conflicts with MC. Mother was pleasant and communicative but missed visits when she was busy or did not have a ride, and when MC brought R.E. close to mother and phoned to let her know she could see R.E., mother either did not respond or said she was busy. She lived in a motel with her girlfriend, who smoked marijuana and was not willing to drug test. Mother wanted R.E. to live with them and her girlfriend would babysit. Mother began drug education, life skills/relapse prevention, 12-step meetings, and individual counseling with a drug counselor. She was not in therapy but was taking

5

Seroquel as prescribed, and was engaging well, although she had poor insight. Mother had tested positive for cannabinoids three times in April and once in May 2014.

DCFS recommended that a clinician assess mother's relationship with R.E. and that a psychiatrist perform a diagnosis and prognosis. DCFS did not have enough information to assess R.E.'s safety with mother and continued to recommend monitored visits.

A report on October 30, 2014 stated that mother's drug rehabilitation program terminated her for noncompliance (failing to test and attend group and individual sessions), refusing to sign a contract, and walking out of the center. Mother had weekly visitation but last visited R.E. five weeks ago. MC told DCFS she had recorded mother's call cursing, yelling, and threatening MC. DCFS again indicated that it did not have enough information to decide that R.E. would be safe living with mother. A last-minute information stated that mother refused a referral to the inpatient program, had not appeared for a mental health evaluation, and MC reported that mother told R.E., "fuck you," when R.E. did not want to be hugged.

An addendum report on February 24, 2015 stated that mother was transient and not attending any drug programs, tested positive for cannabinoids on November 19 and December 17, 2014, and had not appeared for a mental health assessment. She visited R.E. on February 13, 2015 for the first time since September 2014. Mother now agreed to visit R.E. every other week at the DCFS office, where visits had been moved because after R.E. broke her leg in an accident going down a slide with MC's son, mother threatened to break the son's leg and also threatened to kill MC and her children. Mother only took her medication sometimes. She had two successful and appropriate monitored visits with R.E. R.E.'s cast had been removed, she had completed therapy, and she did not qualify for regional center services, as her development was on target. In April 2014 (10 months earlier, after R.E. was detained) mother had told the social worker that she and her girlfriend had asked for money outside of a CVS pharmacy, and mother thought they would have gotten more if R.E. had been with them; MSGF reported that he had seen them begging there in May 2014, and they had yelled and cursed at him.

6

**March 17, 2015 jurisdiction/disposition hearing**

The jurisdiction/disposition hearing took place on March 17, 2015, a year and a month after DCFS filed the petition. MSGF testified that he made the initial referral to DCFS because mother once came home smelling of marijuana. The baby was well cared for, and MSGF had never seen mother smoke around R.E. or fail to change R.E.'s diaper. Mother travelled to Tijuana with R.E. without incident, took R.E. to the doctor, and only gave R.E. Cheetos once. He did not know that mother had used methamphetamines, had been diagnosed with mild retardation, or had been prescribed medication which she did not take, and he had no concerns about mother's behavior.

MGM testified that mother and R.E. had lived with MGM since R.E.'s birth. Mother took good care of R.E., who was always happy. Mother just needed guidance, and MGM would not be concerned if the court returned R.E. to mother's care. MGM denied mother was diagnosed with mild developmental delays or as bipolar, and did not know if mother had ever used drugs or smoked marijuana, although Mother had been prescribed Seroquel for ADHD.

Mother testified she was once more living with her parents, who were willing to help with R.E. She only smoked marijuana after "they took her away and because I was stressed out." She had never smoked or been under the influence around R.E. She took R.E. to well-baby checkups and did everything for R.E., although MGM and MCSF gave advice and pitched in. R.E. was happy, and no one had told mother she was behind in her development or underweight. She only gave R.E. a Cheeto once, sometimes cooked for R.E., and changed her diaper regularly. Mother took R.E. on the bus to visit father in Tijuana without incident. When she went out, she always arranged for MGM and MSGF to care for R.E. She left for a few days after R.E. was detained, because she was so upset. Mother had gone back to the clinic after talking to the social worker, had seen a doctor, and was now taking Seroquel for attention deficit hyperactivity disorder. She did not need marijuana as Seroquel calmed her down, and if it made her sleepy she took a nap and had MGM care for R.E. or had R.E. lie down with her. She denied she told DCFS that she had been diagnosed as bipolar. Mother had not used methamphetamine

7

for more than four years and was clean and sober. She would not object to staying in MGM's home but was capable of caring by herself for R.E., who cried every time mother left after a visit.

As to jurisdiction, mother's counsel argued that at the time of the petition there was no evidence mother was then using methamphetamine, that she was bipolar, or that she was unable to care for R.E. because of her mental capacity. Mother's marijuana use was disputed and was not itself enough to show a risk of harm to R.E., who was always well cared for. The petition should be dismissed and the court should not take jurisdiction. R.E.'s counsel called the grandparents' testimony disingenuous, and asked the court to sustain both allegations. Counsel for DCFS agreed, as mother smoked marijuana regularly, had repeatedly told the dependency investigator that she had been diagnosed bipolar, and at the time of the petition, was not taking her medication.

The court found the grandparents "were not as credible as they could have been" as witnesses, and mother's testimony and her statements in the reports were "most credible." The court amended (b)(1) to read: "mother . . . has a history of substance abuse including the use of methamphetamine and is a recent user of marijuana, which renders the mother unable to provide regular care and supervision of the child. In December of 2014 and on prior occasions, the mother was under the influence [of] illicit drugs, while the child was in the mother's care and supervision. The mother's substance use endangers the child's physical health and safety and places the child at risk of physical harm and damage." The court amended (b)(2) to read: "mother . . . has a history of emotional problems, including mother's need for psychotropic medication, which periodically renders the mother unable to provide regular care of the child. On prior occasions, the mother failed to take the mother's psychotropic medication as prescribed. The mother's emotional condition endangers the child's physical health and safety and places the child at risk of physical harm and damage." The court struck the allegation of mental problems as there was no direct evidence that mother was bipolar, despite mother's statements, and sustained both allegations as amended.

As to disposition, the court was not ready to return R.E. to mother on the condition she live with the maternal grandparents: "The court would like to see the grandparents' veracity improve." The court believed mother did use marijuana in the home at least as MSGF stated, and wanted to see her test negative for marijuana. Most of the evidence showed that mother could not care for R.E. on her own. The court ordered R.E. to remain in her current placement, with reunification services for mother including weekly drug testing and counseling, parent education, individual counseling, a 12-step program, and continued visits to mother's psychiatrist. DCFS had discretion to liberalize mother's monitored visitation.

Mother filed this timely appeal.

## DISCUSSION

### I. Substantial evidence supported the jurisdictional finding.

We review the record for substantial evidence, contradicted or uncontradicted, supporting the juvenile court's finding of jurisdiction, resolving any evidentiary disputes in favor of the court's decision and drawing all reasonable inferences to support its decision. We cannot reweigh the evidence and we leave to the trial court credibility determinations and issues of fact. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

"'A jurisdictional finding under section 300, subdivision (b) requires: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation, and (3) "serious physical harm or illness" to the child, or a "substantial risk" of such harm or illness.'"'" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1259.) At the outset of the hearing, the juvenile court stated it would "put aside, essentially, what may have happened after the case was filed, and we will address the petition first," indicating it would not consider evidence subsequent to the filing of the petition in April 2014 in determining jurisdiction. But DCFS must show "'that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur.' [Citation.] [¶] Although evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the

9

defined risk of harm.' [Citations.] Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136.) We must assess whether substantial evidence supports a conclusion that in March 2015, thirteen months after the filing of the petition, mother's alleged behavior put R.E. at a substantial risk of serious physical harm in the future.

**Past drug abuse and current marijuana use, (b)(1)**

"It is undisputed that a parent's use of marijuana '*without more*' does not bring a minor within the jurisdiction of the dependency court. [Citation.] The same is true with respect to the use of hard drugs." (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.)

In (b)(1), mother's history of drug *abuse* referred to her use of methamphetamine, which had ended more than a year before R.E.'s birth, more than three years before DCFS filed the petition, and more than four years before the jurisdiction hearing. Methamphetamine abuse ending more than four years earlier, with no evidence of relapse or resumption, is not substantial evidence that a risk of harm to R.E. existed at the time of the hearing. (*In re Destiny S.*, *supra*, 210 Cal.App.4th at p. 1004.) The allegation as amended did not state that mother currently abused drugs but that that mother was a recent *user* (not abuser) of marijuana, making her unable to care for R.E., and that the previous December and on prior occasions,[3] mother was under the influence while R.E. was under her care and supervision. The only evidence regarding marijuana use when R.E. was under mother's care was MSGF's statement to the social worker that in December 2013 mother had smoked marijuana twice with R.E. nearby. In disposition, the court credited this statement and concluded that mother used marijuana in the home. Yet "[t]here is no evidence in this case that Mother's drug use caused her to neglect [the minor]." (*Ibid.*) In addition, at the time of the hearing mother's last positive test for

---

[3] The original petition, filed in February 2014, included the statement that in December 2014 (10 months later) and prior occasions mother was under the influence of marijuana. The reference should have been to December 2013.

10

marijuana was three months earlier. (*Ibid.*) There was no evidence of past harm to R.E., and mother's use of marijuana in the home twice, a year and three months earlier, is not sufficient evidence that R.E. was at a substantial risk of serious harm at the time of the hearing. (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 727–728.) The trial court's sustaining of (b)(1) is not supported by substantial evidence.

**History of emotional problems and failure to take psychotropic medication, (b)(2)**

In (b)(2), the court struck any reference to mental problems or bipolar disorder. The sustained allegation states that mother had a history of emotional problems which made her unable to provide regular care and supervision of R.E., mother needed psychotropic medication which she sometimes failed to take as prescribed, and therefore mother's emotional condition endangered R.E. This allegation is supported by substantial evidence.

Both MGM and MSGF repeatedly stated that mother was unable to care for R.E. properly, failing to change her diaper, leaving her in a urine-soaked playpen, going out for long periods of time without making arrangements for R.E.'s care, coming home late at night wanting to take R.E. out with her, and feeding her inappropriately. R.E.'s father also stated he did not think mother could care for R.E. on her own. Mother told DCFS she wanted to take R.E. to live in a motel with mother and her girlfriend, who would babysit R.E., although the girlfriend smoked marijuana and would not agree to drug test. Mother also told the social worker that she and her girlfriend had begged for money outside a drugstore and would have gotten more money if R.E. had been with them. Mother walked out on her drug rehabilitation program. She did not appear for two mental health evaluations, or for an evaluation of her interaction with R.E. She said "fuck you" to R.E. when the toddler did not want to be hugged. While MC was caring for R.E., mother cursed, yelled, and threatened MC on the telephone, and later threatened to kill MC. She visited R.E. only sporadically, sometimes failing to visit for more than a month, and showing little interest even when R.E. was nearby. Mother's angry and aggressive behavior continued during the year and a month before the hearing.

11

Further, there was significant evidence that mother did not regularly take Seroquel as prescribed. Mother herself stated that she needed the medication to control her frustration and anger, but had stopped taking it more than a year before the petition was filed without consulting her doctor, and she did not see a therapist. Throughout R.E.'s detention, mother took the medication erratically. At the hearing, mother stated she was taking Seroquel regularly, but a month earlier DCFS reported that mother had said she took it only sometimes. Although mother stated at the hearing that she was seeing a psychiatrist, the doctor whose name she had provided was an internist.

Substantial evidence supports the trial court's conclusion that mother was unable to care for R.E. on her own, and that her emotional condition and resulting behavior, due at least in part to her failure to regularly take her medication, put R.E. at substantial risk of harm at the time of the hearing. There is no psychological evaluation in the record, as mother twice failed to appear for such an evaluation. "Because the matter to be determined at the jurisdictional hearing is whether a child is at substantial risk of harm at the hands of a parent, due to parental acts or inactions, if that assessment can be made within ordinary experience, no expert is necessary. [¶] . . . Screaming, swearing and demonstrating indifference toward an infant are acts which a lay person will understand as inconsistent with care-giving." (*Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202, fn. omitted.) Ordinary experience supports an assessment that mother's emotional condition endangered R.E., who was not quite three years old at the time of the hearing.

Mother argues that although she was transient as recently as a month earlier, at the time of the hearing she was once again living with maternal grandparents, who stated they would help her care for R.E. DCFS, however, had not approved the home of maternal grandparents for placement because MGM had prior substance abuse and mental health issues. Further, although Mother was living with the maternal grandparents at the time R.E. was detained, she then left immediately, and during R.E.'s detention mother repeatedly stated she wanted to take R.E. to live with her outside of the maternal grandparents' home. Both maternal grandparents expressed concern that R.E. was not

12

safe in mother's care, and the trial court was entitled to disbelieve their statements to the contrary in their hearing testimony. In the absence of dependency jurisdiction, the evidence supports a conclusion that there is a substantial risk that mother would take three-year-old R.E. into an unsafe environment where R.E. would be subject to mother's instability, outbursts, and aggression. The trial court's sustaining of (b)(2) is supported by substantial evidence.

## II. Substantial evidence supported removal.

A dependent child may be removed from a custodial parent if the juvenile court finds by clear and convincing evidence that there would be a substantial danger to the child's health, safety, protection or well-being if the child were returned home, and there were no reasonable means to protect the minor without removal. (§ 361, subd. (c)(1).) On appeal we use "'the usual rule of conflicting evidence . . . giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.'" (*In re Angelique C.* (2003) 113 Cal.App.4th 509, 519.)

Mother made no separate challenge to the court's removal order, and "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) We have discretion to excuse forfeiture only if a case presents an important legal issue. (*Ibid.*) No such issue is presented by this case.

In any event, sufficient evidence supports the removal order. During the more than a year after detention and before the hearing, mother failed to engage with the services offered her, failed to visit R.E. regularly, and threatened R.E.'s caregiver and her children. Although at the time of the hearing she was no longer a transient and was living with the maternal grandparents, the trial court found them not credible and declined to place R.E. there with mother. Further, MGM's substance abuse and mental health issues had made the home an unsuitable placement after detention. Giving full effect to this evidence, we agree that release to mother in the home of the maternal grandparents was not a reasonable alternative to removal.

13

**DISPOSITION**

The court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

LUI, J.